UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

       Plaintiff,

 -vs-                           Case No. 17-CR-6-JDP

ADAM EDWARD MARANTO,              Madison, Wisconsin
                                   March 3, 2022
        Defendant.             10:14 a.m.
_____

STENOGRAPHIC TRANSCRIPT OF JUDICIAL REVIEW
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

                  Office of the United States Attorney
                  BY:  ELIZABETH ALTMAN
                  Assistant United States Attorney
                  222 West Washington Avenue, Suite 700
                  Madison, Wisconsin  53703

For the Defendant:

                  Jones Law Firm
                  BY:  WILLIAM R. JONES
                  P.O. Box 44188
                  Madison, Wisconsin  53744

Also appearing:  ADAM EDWARD MARANTO, Defendant
                  BRAD SCHALOW, U.S. Probation Officer
                    (Appearing telephonically)

Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703
(608) 261-5709

```
 1                (Proceedings called to order at 10:14 a.m.)

 2                THE CLERK:  Case No. 17-CR-06-JDP-1, the United States

 3      of America v. Adam Edward Maranto.  Court is called for a

 4      judicial review.

 5           May we have the appearances, please.

 6                MS. ALTMAN:  Good morning, Your Honor.  The United

 7      States appears by Elizabeth Altman.

 8                THE COURT:  Good morning.

 9                MR. JONES:  Mr. Maranto is here in person and with his

10      attorney, William Jones.  Good morning, Your Honor.

11                THE COURT:  Good morning to both of you.

12           And, I'm sorry, I had a call immediately before this, so I

13      don't know if we have the supervising officer on the phone?

14                OFFICER SCHALOW:  We do, Your Honor.  This is Brad

15      Schalow.  Good morning.

16                THE COURT:  All right.  Good morning, Mr. Schalow.

17           All right.  So we're here on the petition for review of

18      supervised release.  I understand that we have stipulations, but

19      maybe Ms. Altman can just sort of summarize where we are at the

20      moment and what the government is seeking.

21                MS. ALTMAN:  Yes, Your Honor.  You are correct that we

22      do have a stipulation in Document No. 10 that the defendant

23      admits to the violations, that is, a conviction in state court

24      for possession of child pornography.  The guideline range is

25      then 8 to 14 months.  The government would, as it does often in
```

1    cases like this, not always but often, would recommend that be

2    served concurrent to his time in state court since it is the

3    basis for the revocation.  It's the same conduct, I guess, and

4    he did get a very long sentence in state court and has been

5    sitting in county jail for three years.  So we think that that's

6    the appropriate sentence as far as custody.

7         As far as supervised release, the defendant objects to

8    three, I think, conditions --

9             MR. JONES:  Two conditions.

10            MS. ALTMAN:  Two conditions, the polygraph and the

11   financial condition.  The government believes both of those are

12   warranted for the reasons in the revocation summaries.  I can

13   expand on that if the Court wants.

14        We would also ask though that he be -- a term of supervised

15   release of life be imposed to follow his release from custody so

16   that he remains on federal supervision for life.  I believe

17   that's what he had before, and considering that this is at least

18   his second offense of this type, he's shown that he needs to

19   have the federal supervision to control his behavior to the

20   extent it can be controlled at all.

21            THE COURT:  Okay.  And so if I understand correctly

22   then, Mr. Jones, you agree with that proposal in terms of the

23   sentence being run concurrent, and given the length of the state

24   court sentence, the concurrent versus consecutive is really the

25   decisive concern here because if it runs -- even if I gave the

1   maximum sentence, if it were to run concurrent with state court,

2   it would result in no net additional incarceration.

3          MR. JONES:  Right, right.  However, Ms. Altman

4   estimated the guidelines at 8 to 14, I think.  I thought it

5   would be more accurate to say 5 to 11 as a Grade C violation,

6   given that I believe Grade C violations are if you're convicted

7   of something that's no more than a 20-year max.

8          THE COURT:  The Document No. 5 has the analysis that

9   the maximum term of imprisonment for a Class D felony in

10  Wisconsin is 15 years, the maximum term of extended supervision

11  is 10, for a combined total maximum penalty of 25.  Therefore,

12  the most serious alleged violation is a Grade B violation, and

13  so is --

14         MR. JONES:  Could you -- I was just turning to document

15  5.  Could you identify --

16         THE COURT:  Sure.  It's kind of right in the middle of

17  the page.  The subheading over on the side is *Penalties*.  It's

18  in that second full paragraph.  It says the maximum term of

19  imprisonment for a Class D felony in Wisconsin is 15 years --

20         MR. JONES:  Sure.  I see that.  So the Grade B

21  violation.  I guess my question is the assessment -- and you do

22  do that academic assessment whether you use the maximum initial

23  period of incarceration or the total sentence in and of itself.

24  So we have a guideline of either 5 to 11, I think, or 8 to 14.

25  If the Court would be inclined to go somewhere between 8 and 11,

1    it would become moot, and I wouldn't object to a concurrent

2    period of incarceration between 8 and 11.  Otherwise, I would

3    have to -- I'm only just going off of my gut understanding of

4    how initial confinement and required extended supervision apply,

5    and I'm under the impression that you use the maximum that could

6    possibly be sentenced at the time of your first sentence to

7    identify the seriousness of the offense.

8         THE COURT:  Maybe Mr. Schalow can help us out on that.

9         In terms of classifying this as a Grade B or Grade C, what

10   number do we look at, Mr. Schalow?

11        OFFICER SCHALOW:  Yes.  Your Honor, I have the

12   guideline manual open right now, and it says a Grade B violation

13   is any conduct constituting any other federal, state, or local

14   offense punishable by a term of imprisonment exceeding one year.

15   So it just has to meet more than one year imprisonment to be a

16   Grade B violation.

17        THE COURT:  Okay.  Yeah.  So --

18        MR. JONES:  It certainly meets that.

19        THE COURT:  Yeah, it does.

20        MR. JONES:  Okay.

21        THE COURT:  So it is a Grade B violation.

22        MR. JONES:  So I guess the only question I had is why

23   this is -- if the Court -- at one point it said -- it did two

24   guidelines, one if it's a C or one -- is that because he had not

25   yet been convicted in the first one?  Is that --

1          THE COURT:  You're looking at Document No. 3?

2          MR. JONES:  Yeah.  Perhaps that's the one -- no.  Yeah,

3     yeah.  That may have been why I thought that there was a

4     question of whether it was a C or a B, and I don't see C on the

5     subsequent so --

6          THE COURT:  Well, I think -- Mr. Schalow can confirm

7     this, but my understanding is that Document No. 5 came after the

8     conviction, so all ambiguities were removed.  It wasn't

9     necessarily clear what the conviction would necessarily be at

10    the time.

11         MR. JONES:  Right.  And I think that I now see that

12    that was my error when I prepared the memo, so I don't think I

13    have a good-faith argument to say it's not a Grade B violation,

14    as the government has represented.

15         THE COURT:  All right.  Let me just pose one question.

16    And I'm inclined to accept the idea that, given the length of

17    the state sentence, that it would be appropriate to run this

18    concurrent with the state sentence, the incarceration term, but

19    let me raise the one concern or potential counter-argument, and

20    that is that we have the state offense, and the state has taken

21    its punishment for the state offense, but we also, in addition,

22    have a violation of federal supervision and that there should be

23    an additional penalty for the violation of the breach of trust

24    of the federal supervision and there should be an incremental

25    punishment for that.

1    And I guess I'll start with Ms. Altman, because the

2    government would be perhaps in the position to press that

3    argument.

4         MS. ALTMAN:  I don't mean to be flip, Your Honor, but

5    I've made that argument to this court and the other court 20

6    times and have --

7         THE COURT:  What's your win/loss record?

8         MS. ALTMAN:  Loss, loss, loss, loss, loss.  I

9    continually lose that argument, Your Honor, and, in fact, you'll

10   see this afternoon there's another case very similar to this

11   where we're making the same recommendation.  I know that the

12   case this afternoon the -- it's sort of apples and oranges

13   because it's two federal convictions, but the sentencing

14   guideline range is less than the ten years, and so there is sort

15   of -- he's getting an additional punishment by the distance

16   between the two.  I did not -- I don't know what his guideline

17   range would have been had this come to federal court, had we

18   taken the case, but I guess what the Court generally tells me

19   when I ask for more time on that is that this is a really long

20   sentence and that the additional nine months doesn't make a

21   difference really one way or the other.

22        THE COURT:  Yeah.  I know in some cases I have imposed

23   an additional term of incarceration to reflect the federal

24   violation but I think usually not in cases where I'm dealing

25   with a state sentence of this length so --

1         MS. ALTMAN:  And, to be fair to the Court, that's

2     generally what my sentences are.

3         THE COURT:  Yeah.

4         MS. ALTMAN:  I'm not usually looking at 24 months and

5     12 months.  I'm usually looking at 10 or 15 just based on the

6     nature of the cases that I charge, and I think that's why I get

7     turned down so often.  Certainly it isn't because of my advocacy

8     skills.

9         THE COURT:  Of course.  It couldn't possibly be that.

10    No, and I'm inclined to -- I'm inclined to go that way here too.

11    And if I just look at the circumstances -- so I've got -- how

12    many more years do we have in the state sentence to serve?

13    Three or four years now?

14        MR. JONES:  Seven.

15        THE COURT:  Seven more?

16        MR. JONES:  Yeah.  I'd also say that given that he got

17    ten years for what is possession -- one count of possession, I

18    have to believe they took into consideration in such a long

19    sentence the fact that he was on supervision.  I don't have the

20    transcript.  So it probably impacted the state court in the

21    length of the sentence also, so it did have some collateral

22    impact.

23        THE COURT:  It's a factor that I consider in

24    sentencing, so I agree.  And I just look -- you know, we look

25    down the road seven years from now, and then what are we going

1    to accomplish with another couple years in prison, in federal

2    prison.  So I don't feel the need to exact another period of

3    incarceration as appropriate punishment here.  So I agree that

4    the concurrent term is appropriate.

5        The guidelines on revocation are so coarse -- they're not

6    very fine-grained -- so, you know, I have my issues with the

7    guidelines in original sentencing.  I find the guidelines kind

8    of really highly uninformative when I just -- they're just

9    driven by, you know, Class A, B, C violations, and I just have

10   these rough, rough measures here.  In this case, I take this as

11   a very serious violation, so it might warrant a sentence, you

12   know, longer than 14 months, but, again, that's just -- it does

13   become kind of academic when I have such a long state sentence.

14       So I will impose -- well, I'm inclined to impose -- I've

15   got to hear from Mr. Maranto first, but I'm inclined to impose a

16   guideline sentence and run it concurrently, so that's what we'll

17   do.  I don't find the guideline especially informative, but it

18   doesn't make sense to stress over it when it's not really going

19   to make any actual difference in Mr. Maranto's life.  Then we're

20   going to have a debate about the conditions, but maybe I should

21   hear from Mr. Maranto or at least give him the chance to talk

22   before we turn to the conditions.

23       I've tipped my hand very strongly about what I am inclined

24   to do on your sentence, Mr. Maranto, but before I actually

25   impose it, you've got the right to be heard.  So you don't have

1    to say anything, but I'd be eager to hear from you if you have

2    anything to add.

3          THE DEFENDANT:  As far as the length of the -- what

4    you've described, it would be -- it's pretty clear that it's

5    appropriate in this situation, and I don't contest it.

6          THE COURT:  Okay.  All right.  Very good.

7        All right.  So in terms of the sentence, I'll impose the

8    14 -- I'll revoke.  I think it's mandatory given the nature of

9    the offense here.  It's certainly warranted, so I will revoke.

10   I'll impose a 14-month sentence, and I will run it concurrent to

11   the state court sentence.

12       Then in terms of the conditions -- and then I don't know if

13   we have any argument about the term of supervision.  I'm

14   inclined to reimpose the life term of supervision.  I think we

15   have a long history of violations here, and I can't -- I was

16   more focused on the objections to the conditions.  I don't know

17   if Mr. Jones responded to the length of the supervision.

18         MR. JONES:  I didn't.  I have spoken with Mr. Maranto,

19   and he understands it would be a bit odd to be advocating for

20   something less than what he had -- had already been imposed, but

21   he did want to go on record to say it just -- as someone -- I've

22   never been on life supervision.  So he is facing life

23   supervision, and as someone on life supervision, his take is

24   it's somewhat unproductive to not have some light at the end of

25   the tunnel where you have the incentive to really work on it and

1    be successful on supervision if it's just the rest of your life

2    facing you.  I don't know what options people have to shorten

3    that if they do well, but I don't know what good-faith argument

4    I could make to say, well, having violated, he should have it

5    shortened.  It does cite a lot of good behavior as far as his

6    work history and completing sex offender treatment, but we are

7    facing revocation for similar behavior.

8         So he may want to speak more about whether -- as someone

9    who is facing lifetime supervision just for -- to be heard on

10   how he thinks that may be a positive and negative as far as his

11   rehabilitation.

12            THE COURT:  Sure.

13            MR. JONES:  I think I'm just kind of voicing what he'd

14   like to be said.  I don't really have a position on what a

15   good-faith argument would be.

16            THE COURT:  Let me ask him, and then I'll ask Mr.

17   Schalow about the question of early termination of a life term

18   of supervised release, because I think you can petition for a

19   termination of the life term just like you can petition for

20   early termination of a term of years.  Obviously, the case you

21   would have to make would probably have to be much more

22   compelling obviously rather than knocking off the last year of a

23   five-year term of supervised release.  That would be a different

24   thing, but let's confirm that first.

25            Mr. Schalow, am I correct you can petition to terminate a

| | |
|---|---|
| 1 | life term just as you can do a specified term? |
| 2 | OFFICER SCHALOW:  Yes, I believe so, Your Honor. |
| 3 | THE COURT:  Yeah.  So, like I said -- |
| 4 | MR. JONES:  That would be the motivation, sure. |
| 5 | THE COURT:  All right.  Mr. Maranto, do you want to |
| 6 | speak on the issue of the term of supervised release that would |
| 7 | follow? |
| 8 | THE DEFENDANT:  I would, and I agree with my attorney |
| 9 | in that while, yes, I was imposed a lifetime supervised release |
| 10 | sentence from Judge Rafeedie in California, over the period of |
| 11 | time that I have been on supervised release, it has been more of |
| 12 | a -- it's been just sitting in the back of my mind that there is |
| 13 | no light at the end of the tunnel.  There is no way to become |
| 14 | rehabilitated, like you said.  With knowing that you're on |
| 15 | lifetime supervised release, there is no rehabilitation.  I |
| 16 | mean, it can't exist. |
| 17 | So I would -- I move the Court to, number one, inform me, |
| 18 | as I was not aware that I could petition to get off lifetime |
| 19 | supervised release before.  I suppose that's an oversight on my |
| 20 | part, but I'm not going to take full responsibility for that |
| 21 | oversight.  At the same time, Your Honor, I would ask you to |
| 22 | give me some kind of light that I can see at the -- we keep |
| 23 | using the cliche "at the end of the tunnel" -- something that I |
| 24 | can work forward to, something that I can see tangibly instead |
| 25 | of just an up-in-the-air thing that nobody is really going to -- |

1    you know, "Well, I don't know.  I don't know.  I don't know."

2    Well, I know at that 20-year mark, if I can make it there --

3    well, if it's 20 years, Your Honor, and I go clean, I can feel

4    pretty strong to say, since I'll be in my 70s by then, that,

5    yeah, the federal government would have done their job,

6    absolutely, and there would be no further violation.

7         So I know the Court is looking for something a little bit

8    more compelling than that but --

9             THE COURT:  I'm always looking for something more

10   compelling, but that's just my job so --

11            THE DEFENDANT:  Your Honor --

12            THE COURT:  Let me ask you a couple of questions.  I

13   take your point, but let me observe it -- make a couple of

14   observations, and then you can respond if you've got anything

15   further.

16        So it seems to me there are kind of two issues.  One is the

17   actual fact of rehabilitation, and one is the -- whether you're

18   being supervised.  And so it's possible for you to be

19   rehabilitated and still be supervised, and when I say

20   "rehabilitated," what I mean is that you are able to control --

21   you either go through treatment and transform your sexual

22   interests so that you're no longer sexually interested in

23   children or that you are able to so control your sexual interest

24   in children that it is such a small factor in your life that you

25   no longer pose a threat of reoffense.  So to me that's what

1    rehabilitation is.  So a person could be fully rehabilitated and

2    still be on supervision.  And so that's why I disagree with the

3    idea that rehabilitation is impossible if you have a life of

4    supervised release -- a life term of supervised release, because

5    you could be rehabilitated and be on supervision.

6         And then the second observation is that there are all sorts

7    of incentives that you have to succeed on supervision even if

8    your supervision is not terminated because supervision varies.

9    The level of scrutiny that you get varies depending on your

10   performance.  So the probation office has people that are deemed

11   to be at low risk, and they get light supervision.  The number

12   of meetings that they have to have with their PO over the course

13   of a year is lower.  You have people on intensive supervision

14   where they have -- they have to meet every week with their PO.

15   So that varies.  How many polygraphs, whether you get polygraphs

16   at all, the liberty that you have in terms of where you go and

17   what you do, all of that varies depending on your performance on

18   supervision.  So even if you were on a life term of supervised

19   release, there are enormous incentives to perform well because

20   you can have great freedom even while being on supervised

21   release.

22        So I do see -- there's no proverbial end of the tunnel, but

23   there's still all sorts of good things that can come from

24   performing well on supervised release.  And then it does seem to

25   me there is that light at the end of the tunnel that you can

1    petition for an early termination.  And I don't want to mislead

2    you.  You know, I know I've talked with the people who supervise

3    sex offenders, and, you know, commonly sex offenders who have

4    crimes against minor children are deemed to be kind of a more

5    intractable kind of risk situation than somebody who commits a

6    property crime.  So I don't want to mislead you about, you know,

7    how eager the supervising officer is going to be to early

8    terminate somebody who is on a life of supervised release yet --

9    you know, which, frankly, is pretty rare, at least in this

10   district.  Now, your life term was imposed by somebody else, but

11   when I look at this case that's in front of me here, I think

12   this is one where I'd be inclined to impose a life term too

13   because of the repeat offenses.

14        So I don't want to mislead you about how likely it is, but

15   there is that possibility if you really perform well, and,

16   again, in this case category, like others, the older you get,

17   the less likely you are to offend, you know.  We've had some

18   pretty old sex offenders in this court.  But, you know, I do

19   think there are incentives for you to succeed while on

20   supervision, and there is that possibility of early termination.

21   So I don't quite -- I'm not quite persuaded by the idea that

22   there's no incentives for you to do well.

23        So, anyway, those are my comments.  I'm inviting a response

24   if you had anything else to say.

25             THE DEFENDANT:  I do see where you're coming from, and

1   I would have to agree with the second part, the second situation

2   that you described.  Yes, there are a lot of leniencies that can

3   be given based on one's performance, and being that I agree with

4   the second part, it doesn't really make any difference if I

5   agree or disagree with the first part, even though I still do

6   disagree with that.

7        THE COURT:  Uh-huh.

8        THE DEFENDANT:  But at the same time, like I said, if I

9   agree with the second part, the first part really doesn't make

10  any difference.

11       THE COURT:  Yeah.  Well, and I understand and

12  appreciate your position, and I understand how dispiriting it is

13  to have something that's defined to be a lifetime.  So I

14  understand that, and I've listened to your argument, but I do

15  think there are lots of incentives for good performance.

16       It's probably appropriate then to turn to the conditions

17  that are objected to.  I'm inclined to agree with the

18  government's position, but let's have Ms. Altman state it, and

19  then we can debate a little bit.  I think there are -- let's

20  just start, first, with Mr. Jones' basic perspective, which is I

21  think he's entitled to conditions that are no more restrictive

22  than are necessary to serve the interests of justice and mostly

23  to protect the community here is really the interest that we're

24  looking at.  So fair point.  These are some pretty intrusive

25  conditions, and so he's entitled to have a pretty solid

1       justification for them.

2            But, Ms. Altman, why don't you tell me why should we have

3       those -- the financial disclosure and the polygraph conditions?

4            MS. ALTMAN:  Yes, Your Honor.

5            With the financial disclosure, I think that it's important

6       for probation to be able to see, first of all, is he working,

7       where is he working, that sort of thing, which will be -- I

8       mean, he can report that, but that's a way to confirm that.  And

9       it's also important for them to see where is his money going.

10      Is he sending it overseas to the Philippines to have people

11      perform live sex shows, as an example; is he buying a cell

12      phone; is he buying a game station, all of those things that he

13      will certainly be limited that he can do.  And it confirms any

14      sort of self-reporting as far as what money is coming in and

15      where it's going, and in this type of case, you don't think of

16      that necessarily being as important as in a white-collar case,

17      but to monitor sex offenders and the things that they can buy

18      and the contact that they can do, it is important.  Is he paying

19      for internet when he's not supposed to have internet, all of

20      those things.

21           With regard to the psychosexual evaluations, the condition

22      simply says that it may involve the use of polygraphs.  I don't

23      think they've ever been required.  Who knows what the technology

24      is going to be in seven years.  Maybe polygraphs are -- have

25      been deemed super reliable and admissible in court.  Maybe

1    they've been totally disproved or replaced by something else.

2    The probation office should have every tool available to assess

3    the defendant's sexual desires, conduct, that sort of thing, to

4    protect the community, particularly for this type of crime, and

5    if a polygraph is needed, then it's a polygraph.  If in seven

6    years something has been discovered about polygraphs that make

7    them, you know, unusable, then in seven years or eight years,

8    you know, depending on when he gets out and how the conditions

9    have been imposed, then maybe it's time for another

10   conversation, but that's not a conversation for now.

11           THE COURT:  All right.  All right.  I think the

12   justification for the financial disclosure to me is compelling.

13   I'll give Mr. Jones a chance to respond once I lay out my view

14   of it, but bottom line is I think that the -- if it were just a

15   matter of where he's working, I think we could probably find

16   that out from other sources.  But I do think, critically in a

17   sex offense case, where the defendant spends his money is really

18   a critical tool because I think there's so many violations --

19   cases that I've had where people buy some device that is

20   internet-capable and it's not disclosed.  It provides a good way

21   of detecting whether the defendant is buying devices or services

22   that are otherwise violations, so getting access to the

23   internet, getting access to sex services online, and getting

24   access to devices.  I think it's an appropriate and useful

25   enforcement tool to make sure that the defendant is compliant

1    with the other conditions of supervision.  So I'm very

2    supportive of that one.

3        The polygraph, here's my view of this:  I'm not going to

4    try -- I'm not going to impose a condition now thinking about

5    science fiction technology that we might have in ten years.

6    That wouldn't be warranted.  So what I'm looking at is right now

7    would a polygraph be appropriate, and it is not required that it

8    be used, but my understanding is that it is, in fact, commonly

9    used with offenders that are on supervision for sex offenses.

10   There has never been and I do not expect that an untruthful

11   response in the polygraph is a grounds for revocation.  I

12   wouldn't accept it as a grounds for revocation, and I don't have

13   to find the violations to, you know, beyond a reasonable doubt,

14   but as far as I know, polygraph examinations aren't even

15   supported as admissible even to a preponderance standard.

16       But that's not really how they're used or why they're used.

17   They are used, I think, because they are -- and that's not to

18   say they're utterly unreliable.  They're reliable enough to

19   prompt truthful disclosures of the people under supervision, and

20   it triggers -- and it works both ways, frankly.  If we get

21   truthful -- indications of truthful response, truthfulness in

22   response to the polygraph examination, it confirms the honesty

23   of the client under supervision, and it can lead to their

24   greater freedoms.  If there's an indication of deception, what

25   usually is prompted is a reinterview and often a further

1    disclosure, and the indications of deception can often prompt

2    further and closer supervision.  They're really not used, and I

3    wouldn't accept them, as a freestanding basis for a violation.

4        And so I have been persuaded, despite my initial skepticism

5    about the use of polygraph examinations and their invasion --

6    how invasive they are, that they are a useful tool of

7    supervision, but they are not themselves a grounds for a finding

8    of violation.  And so that's why I really think that they're

9    useful.  They provide a very useful guide for the supervising

10   officer to tailor other portions of the supervision, and they're

11   reliable enough for that.  And, again, the polygraph operators

12   will tell you it's not a lie detector.  It is not that.  It

13   indicates that the person is under stress when they are

14   responding to the questions, and that stress response is a

15   suggestion of untruthfulness.  So it never really tells you

16   whether you're lying or not.  And so the inferences that I could

17   draw from the polygraph examination would not be enough for me

18   to find a violation based on the polygraph examination.  So

19   that's why I'm inclined to say, yes, I think it's a useful tool.

20       Now, about the standards and quality of the polygraph

21   examination, which aren't articulated here, I just don't -- I

22   don't believe I'm required to and I don't articulate the

23   standards for any other kind of search or testing requirement.

24   So I do not specify in the conditions what kind of drug test has

25   to be used.  They use, in fact, different levels.  So there's

1    field testing and then laboratory confirmation testing.  The

2    field testing is not reliable.  If you had a field test for

3    cocaine, you wouldn't prosecute just on the basis of the field

4    test.  You'd confirm it with lab testing, but the field testing

5    is reliable enough to prompt further inquiry.  So it's the same

6    thing with the polygraph.  I don't have to specify the quality

7    of the polygraph examiner or the polygraph machine.  They'll

8    want to have one that is reliable enough for the test, and

9    because it's sort of at the level of a field test, I think it's

10   even more -- more to the point that I don't have to specify what

11   quality polygraph examination is going to be used because I'm

12   never going to use it for a freestanding violation.

13        So, Mr. Jones --

14            MR. JONES:  Okay.

15            THE COURT:  -- a chance for your last-minute --

16   last-ditch rebuttal.

17            MR. JONES:  Sure, sure.  Thanks.

18        As it relates to the financial, I mean, I can appreciate

19   that, sure, you could identify that someone has signed up for an

20   internet provider by demanding his bank records.  Sometimes

21   those are automatically withdrawn or a payment online might show

22   what's this to, you know, whatever, Spectrum?  Do you have

23   another internet provider?  I get that it could be used as a

24   tool, but the way that the condition is worded here is really

25   unfettered demand for all financial, you know, information, and

```
1    financial information could really stretch out to a lot that
2    could be tenuously connected.  And I just think that it's really
3    not at all -- it's almost anything and any -- anything that has
4    to do with financial transactions would be justified to demand.
5    So the objection is, in part, that it's not sufficiently
6    structured to be specifically restrictive or intrusive to
7    address that.
8         So if it said any financial record, you know, based upon
9    some sort of, you know, probable cause that he has -- "I think
10   you're using other internet; let me see your bank account for
11   that purpose," that would be justified, but this is a really
12   wide-open power to the agent to say, you know -- and it's just
13   so -- because I just want to review your financials, finances,
14   and I don't have to tell you why or that I believe there's
15   something there.  I just want it.  It's just such an impediment
16   to people moving about in their life.  Imagine if I had to come
17   up with all -- you know, everything.  You know, show me all the
18   payments you've made to help your kid in college.  You know,
19   God.  Okay.  I guess I could put it all together, but that would
20   stop me in my tracks as far as trying to just get on with what's
21   going on, and if there's no significant basis for the belief
22   that there's something going on, there's just nothing there.
23        So I just think that it's too -- I guess the
24   counter-argument would be, yes, it could be used for that, but
25   it could also be used just too widespreadingly, and it would
```

1    just be -- it just obstructs the daily existence of these type

2    of people, these people that are just trying to go it.  So that

3    would be my argument as far as the extensiveness of it, the

4    broadness of it.

5         And then as it relates to the polygraph, I mean, do you

6    have some ability to say, you know -- they specifically state

7    polygraph for a reason here, but, you know, polygraphs also

8    could prompt false confessions and create all sorts of problems.

9    "Hey, it says you're not being honest about viewing child

10   pornography.  Come on.  I mean, you're lying to us."  So some of

11   the people are going, well -- you know, they find themselves --

12   imagine the panic if you hadn't done anything wrong.  "Well,

13   maybe I watched something on -- when I was at work or something.

14   Maybe I'm thinking of the one time I saw it."  And since it's

15   not particularly compelling science as it relates to you are

16   lying or not, you're just under stress, well, who isn't?  I

17   mean, unless you're completely in control of your faculties, it

18   would be very stressful to take a polygraph because you're like,

19   "What if I fail this even though I'm telling the truth?"

20        So I'm not particularly championing this cause.  I'm

21   championing my client who asked me to raise those two because he

22   has been going through, and he's saying it's just not -- it

23   doesn't work.  It doesn't do what people think it's doing.  It's

24   kind of breaking down maybe the trust between the agent and the

25   person being supervised, and if the Court would require some

1      corroboration that he's lying, why not -- you know, why not just

2      bring that corroboration?  But it may be an exercise that may be

3      causing more damage than help, at least that's what I hear from

4      Mr. Maranto, and I've done a few of these -- it seems there's

5      been more and more reviews of these child porn.  Maybe the

6      Federal Defender's has just decided to send the appointments to

7      me, but I've done a few lately.  And it seems like there is kind

8      of a bit of a broken record, and you've heard all of them, that

9      they have this issue with the use of the polygraph, and since

10     the only chance really to communicate about these issues are at

11     the time that they're being imposed, I think Mr. Maranto is

12     raising it and just wanted to express that he -- it's not as

13     helpful as people might think in addressing knowledge.  And he

14     obviously wanted to talk a little about it, but those are the

15     two legal arguments I'd make in response to the government's

16     position or justification for it.

17             THE COURT:  All right.  Mr. Maranto, go ahead.  You can

18     speak up for yourself.

19             THE DEFENDANT:  Okay.  As far as financial oversight,

20     I -- to be honest with you, I have no problem with financial

21     oversight, okay?  I have no problem with, you know -- if Brad

22     wants my records, he can have them, and, you know, he wants

23     them monthly reports, he can have them all filled out.  I have

24     no problem with that.  But he will tell you that there are times

25     when, I mean, I'm at home, okay, and either the house is

1    clean -- I know the house wasn't clean three years ago, but the

2    house is clean.  There's really nothing to do, and I'm looking

3    for something to entertain myself -- and, yeah, I'm 48, but I'm

4    a Nintendo baby, so, you know, I grew up with that kind of

5    thing, and it's enjoyable for me, and it keeps me off the

6    streets.  They say that, you know, the devil's hands is the

7    hands of being idle, and it's true for the most part.

8         So I would ask that, while I do agree with financial

9    oversight, if there could be not necessarily a stipulation but a

10   suggestion saying that it is true that Mr. Maranto sometimes

11   needs some entertainment at home, you know, instead of just the

12   radio, and if, you know, my PO can, you know, can kind of talk

13   about it and say, "Okay.  Well, yes, you can have this, but you

14   can't hook it up to the internet," okay, or something like that,

15   that would be great.  That would take that whole concern and

16   just squash it and say -- then I'd say, "Okay.  Go ahead and put

17   it on there then," okay?  Now --

18            THE COURT:  Now, let's just address that one because

19   that one -- I haven't specifically had to address the video game

20   issue, but it is the same kind of concern that I have when I

21   have a condition in a case like this where we say no recording

22   devices without permission.  You can't get a cell phone without

23   a recording device on it now, and so that is one where I have

24   clarified that, yes, I'm going to put in the condition that

25   there be no recording devices, but it is not my intent that the

1    defendant on supervision is going to be cut off from the entire

2    modern world and can only communicate by telegram.  And so

3    that's one where, you know, we're looking down the road.  I

4    don't know what kind of cell phones are going to be available

5    seven years from now, but it's not my intent that you be cut off

6    from the need to communicate with the rest of the world.  The

7    same analysis would apply to the Nintendo video games, and if

8    you can't resolve it with your supervising officer, you can

9    always petition the Court to address it.

10        And so on the video game issue, I would say I'm sympathetic

11   to this concern.  I think having some entertainment would be

12   appropriate, and so having a video game console, not a problem.

13   Not internet capable, because video game consoles and Roku

14   devices, all sorts of apparently -- to normal civilians who know

15   enough to hook up a Roku device but don't really know what's

16   under the hood, it seems like an innocent device, but they can

17   be put to illegitimate uses by people who are tech savvy.  And

18   so having reasonable controls on the video game console, that

19   seems appropriate, but I would not say that you can't play video

20   games.  And if you have difficulty working it out with your

21   supervising officer, bring it to the Court, and we'll kind of

22   figure out appropriate parameters to make sure that what appears

23   to be an innocent device is used for innocent purposes.  So I'm

24   supportive of that.

25        THE DEFENDANT:  Okay.  Thank you.

1    So I really don't -- while I don't really see the need for

2    it, I don't have a big enough objection to financial oversight

3    to compel the Court to accept that --

4         THE COURT:  Yeah.  And let me just finish up my

5    response, because Mr. Jones raises, I think, a fair point:  Why

6    not treat the financial conditions like the search conditions,

7    which is to say, the search has to be based on a reasonable

8    suspicion?  So we authorize probation officers to search the

9    residence of the offender if there's a reasonable suspicion of

10   search.  And here's my answer to that, and that is that there

11   have to be some searches that can be just, I would say, just

12   prophylactic searches to make sure that there aren't

13   illegitimate uses of funds, for example, and I think that is an

14   appropriate way that is -- I don't think is unduly invasive to

15   look at a person's assets and liabilities and their income and

16   expenses to see if there is illegitimate activity going on.  I

17   don't think that needs to be supported by a reasonable

18   suspicion, partly because I don't think it's as invasive as

19   coming and tossing your apartment looking for contraband.

20        And so that's why I think I wouldn't impose that

21   restriction on the financial disclosures partly because I just

22   don't think it's as invasive as a search of your home.  I mean,

23   after all, I have to disclose all my -- you know, where my money

24   goes annually, and a lot of people who are in positions of

25   public trust have to make very searching financial disclosures,

1    and so it's just not as searching -- not as invasive as having

2    your house searched.  So that's why I think it's appropriate to

3    have that condition without the requirement of being probable

4    cause or even reasonable suspicion.

5        Okay.  So on to the polygraph then.

6        THE DEFENDANT:  Yes.  On to the polygraph.  Some of

7    these the Court may not be aware of, and I do invite the Court

8    to do all their fact checking as much as they like.  The

9    polygraph actually started as a heart monitor machine in 1958,

10   and it has -- at one point it was noticed by law enforcement,

11   and it wound its way into a situation in that it kind of grew.

12   It became a breathing monitor, and it became a movement monitor,

13   and now it's -- it checks your iris, and it uses an algorithm to

14   measure how much your eye moves during the answer to a question.

15   But like Mr. Jones said, there is not a single time that anybody

16   goes into a polygraph test completely confident that they're

17   going to pass it, and the reason why is because they already

18   know that there's some degree of inadequacy in the responses of

19   the polygraph.

20       One thing when someone is looking at the polygraph

21   argument, you really have to look at the reason for a lie.  The

22   reason someone lies is to deceit or deceive someone else without

23   the knowledge of that someone else, okay?  That's the reason for

24   a lie.  Now, one interesting fact is that no other result of

25   anybody else's polygraph has anything to do with an individual

1   polygraph.  Everything is different.  As a matter of fact, as

2   the very first thing that they do, they do what's called a

3   baseline test, and this baseline test is flawed because what

4   happens is the -- and this has happened every time that I've

5   gone to take a polygraph.  That's how I can say this.

6        What the polygrapher will do is they will say, "Okay.

7   Write a number down on this piece of paper," and you write the

8   number down on this piece of paper.  Okay.  And then he takes

9   it, and he tapes it to the wall, and he says, "Okay.  Now, look

10  at it, and now tell me did you write the number one?"

11       And then if you wrote the number three, you say, "Yes."

12       "Did you write the number two?"

13       "Yes."

14       "Did you write the number three?"

15       "No."

16       That's how they take the baseline.  There's a problem with

17  it though.  The person that you're giving the answer to already

18  knows whether it's a lie or not, and that's where the flaw in

19  the base test is.  That happens every single time the polygraph

20  is given.

21       Another fact is that over two questions, the accuracy just

22  plummets.  I mean not -- not like -- it plummets.  And the way

23  the polygraphs are given today or as they were given three years

24  ago, while, yes, in several cases it's right and in several

25  cases -- a broken clock is correct two times a day, okay?  Now,

1    I'm not saying the polygraph is worse than that.  I'm not saying

2    that.  But what I am saying is that the polygraph being used as

3    a tool only on sex offenders now -- I don't know if the Court

4    knows about that.  They do it only on sex offenders or under,

5    you know, some kind of existential circumstance, and, yes, while

6    I am a sex offender and while, yes, you know, there has been a

7    violation here, Mr. Jones here not too long ago, he said that --

8           MR. JONES:  Hang on.  Can I talk to him for a second

9    about what we may have talked about and --

10          THE COURT:  Sure.  Yeah.  Go ahead and counsel.

11       (Discussion held off the record between Mr. Jones and the

12   defendant.)

13          MR. JONES:  I just wanted to give him --

14          THE DEFENDANT:  Okay.  Yeah.  Mr. Jones, he made the

15   point not too long ago that one of the issues that is with the

16   polygraph is false confessions, and I can say this is true

17   because I've done it.  I have also been able to -- I mean, this

18   is kind of -- I have also -- I have also been able to control

19   what the machine outputs, not every time, not all the time, but

20   if I really put my mind to it, I can control those faculties

21   that are supposedly involuntary.  They're not involuntary.  You

22   can train yourself to control them.  You can train yourself to

23   slow your heart rate.

24       You know, there's a very large website, an organization,

25   right now.  It's -- you can read all about it at

1    antipolygraph.org.  It gives all these points and more, many

2    more, on why the polygraph should be considered not necessarily

3    a tool as much as a, well, novelty really.  Brad will tell you

4    that -- well, actually, no, this is when I was under Tracy.

5    There was one polygraph that I went in, okay, and after the

6    polygraph, the administrator, he, you know, called the

7    supervisor, and, you know -- you know, a fire drill went off,

8    and apparently, you know -- now, I didn't -- but that was

9    chalked up as a fluke.  Well, how many of these flukes go on,

10   because it was -- the readings were just off the fricking chart

11   for -- I mean, for every single question.  Forgive my French.

12        But the point is while in some cases, in some specific

13   testings with the polygraph, it seems to be able to detect

14   stress response to a specific question, it may have been the

15   question before.  It may be a question that he -- that the

16   person knows that they're going to answer in the future.  It

17   doesn't have to be that specific question.  There's all kinds --

18   Judge, there's all kinds of problems with the polygraph, okay?

19   And I know that you just got done saying that, yeah, well, you

20   look at the results of the polygraph.  You're not going to sit

21   there and say, "Okay.  Well, you're revoked based off of this

22   polygraph."  I know -- you just said -- you just said that.  I

23   was listening, okay?  But at the same time, it's not the tool

24   that it's, well, made out to be because -- I mean, yes, law

25   enforcement is pro-polygraph.  Yes, of course they are.  But to

1    the other side of the entire population, well, it's a -- I kind

2    of agree that it might -- it might inspire the parole agent to

3    maybe sit down and ask a couple of questions afterwards to kind

4    of clarify, but it's been my experience that when I go up --

5    when I've taken polygraphs and I've been truthful and it's

6    been -- it said I was, you know, lying but I was actually

7    telling the truth, which has happened -- I can actually count,

8    one, two, three -- I'm now over ten, so I'm going to stop there.

9    You know, there's always going to be a post-interview after a

10   polygraph at the -- well, the way the Eau Claire office runs it,

11   there's a post-interview, okay?  And that -- and then -- but

12   when you're done with the test, the administrator tells you what

13   the results are.  "You failed this question; you failed that

14   question," okay?  And your parole agent is listening all the

15   time on one of the monitor things.

16            THE COURT:  Uh-huh.

17            THE DEFENDANT:  So they already know.  And so you go up

18   there, and you talk to them, and, you know, they are making

19   their entire discernment on your situation or performance based

20   off of your -- the output of that machine, and it could be

21   wrong, as I've said.  And as a result, then the parolee would

22   then be either sanctioned or it would be -- you know, have some

23   other requirement that is not warranted because it's not true,

24   but yet the machine -- well, the machine says, and you were

25   asked three different times.  That's part of the problem.  You

1    were asked three different times.  That's part of the problem.

2              THE COURT:  Uh-huh.

3              THE DEFENDANT:  The more questions asked -- it doesn't

4    matter if it's the same question one, two, three times.  The

5    more questions, the more stressful someone gets.

6         So, Your Honor, it is true, and I believe the state has

7    commented that in no uncertain terms, there is no machine that

8    can detect a lie, okay?

9              THE COURT:  Uh-huh.

10             THE DEFENDANT:  There is only this machine that has no

11   formal training for it.  Every person that administers

12   polygraphs, they do it a little differently, and they'll tell

13   you that.  It's not something that you get like a two-year

14   degree in, or it's not something that you go to a trade school

15   or anything like that.  It's basically self-taught, and I don't

16   think it should be -- it should be used in a situation in which

17   the parolee could very well may be sanctioned for telling the

18   truth, but this machine that doesn't know, you know -- that

19   doesn't know anything but whatever the keys are, but this

20   machine is telling me that I'm lying, but, I'm sorry, I was

21   there, you know.

22        And so those instances where the machine is wrong kind

23   of -- it instills a little anger in the person that took the

24   test, especially when they're in front of their PO in the

25   post-interview and they say, "Well, there was some deceit that

1     was measured here."  And I said, "Well, how do you know it was

2     deceit?  Where is this deceit coming from?"  Every single time I

3     have been in the post-interview and we've talked about a failed

4     question, it's always been about deceit, deceit.  It's, like,

5     stamped "deceit" just because one reading was a little higher

6     than the other or whatever the case is.  The polygrapher said

7     that, "Well, he's lying so -- this is deceit so, therefore, he's

8     lying," and that's what your next six months -- you're going to

9     be dealing with this extra sanction or sanctions that you

10    shouldn't have to because it was -- you were telling the truth.

11             THE COURT:  Uh-huh.

12             THE DEFENDANT:  So I don't think it should be used as a

13    tool as, you know, as strongly as it is.  In cases that -- such

14    as this one, okay -- this case is about child pornography.  I

15    mean, I can't -- I mean, I can be ashamed of it, but at the same

16    time, I can't -- you know, I can't -- I can't let it, you know,

17    bury my head in the sand and just sit there for the rest of my

18    life.  I can't do that.  I have to move forward because life is

19    moving forward, and it doesn't stop, okay?  And when Brad calls

20    me or I get a letter in the mail from somewhere in Wisconsin

21    saying that I have to show up at Eau Claire to take a polygraph,

22    it's not that I'm saying, "Oh.  Oh, no.  I've done this.  I've

23    done" -- no, no, no.  It's just the stress of having to go in

24    there and have a machine tell you whether you're lying or not

25    and then have your PO, you know, decide the next six months

1    based off of that.

2        I mean, I'm sorry I'm getting a little -- I don't know --

3    animated, but at the same time, it's a -- it's a point for me.

4    You know, it's something that I know quite a bit about because I

5    have done quite a bit of research, and I -- as I said, I don't

6    think it should be used as the tool it is being used as today.

7            THE COURT:  I -- you know, I've talked with the

8    probation office about the polygraph use, and, you know, when I

9    got on the bench and I first started encountering it, I shared

10   all of the concerns about the fact that it was not deemed

11   accurate enough to be admissible in court, so why should it be

12   used?  And so I raised those concerns with the probation office,

13   and they arranged, helpfully, a demonstration of a polygraph,

14   and so they persuaded me of its usefulness, and I'm still

15   persuaded of that.  But, you know, this is the first time I've

16   had a really fulsome discussion of the issue with somebody who

17   is on the other end of the machine.  So I appreciate your taking

18   the time to lay out your concerns.

19       I am going to impose the condition in this case, but I

20   will, again, reflect on the use of the polygraph.  I will

21   discuss it again with the probation office.  I'm also going to

22   have your concerns transcribed so that other people can see it

23   so, you know, Tracy and the other officers who use it and Lori

24   Baker, who is the chief probation officer now, can look at it.

25   So we'll have another discussion about it.

1          Some of your concerns I think I've already anticipated.
2     Like I said, I recognize the shortcomings of it.  Many of the
3     things that you identified were discussed with the polygrapher
4     who was there to do the demonstration, so I do recognize -- and
5     I think the two points that I want to emphasize here is I
6     recognize the limitations of the accuracy of a polygraph.  I
7     recognize it is not a lie detector, and I know that it is
8     discussed that the responses to the polygraph are -- it doesn't
9     say you're lying, but it does say something pretty close to it,
10    which is the polygraph contains indicators of deception.  So the
11    difference between that and accusing you of lying is a pretty
12    fine one, so I understand your reaction to it.  But, like I
13    said, I think that in the run of cases, I've been persuaded that
14    it's accurate enough to be useful, but you've said many things
15    that make me think about that.
16         But, also, the second point that I want to stress is not
17    only do I recognize the shortcomings of the accuracy of it, I
18    would never use the polygraph itself as the basis for a
19    revocation.  So it's -- you wouldn't face that sanction, but I
20    do take your point that it can have an impact on the conditions
21    of your supervision, not the legal conditions -- those are
22    imposed by the Court -- but the implementation of those
23    conditions for a period of six months or so.  So I
24    recognize that it does have -- if I say it's a useful tool, it
25    does mean it affects your supervision, so I take your point.

1      As I said, I'm going to impose the condition.  I think it's

2   warranted, but I appreciate having your comments.  I will give

3   them some further consideration, and I'll take it up with the

4   probation office.  So thank you.

5          THE DEFENDANT:  Thank you.

6          THE COURT:  All right.  All right.  So I think those

7   are the only two conditions that you objected to, and so,

8   otherwise -- let me just confirm that, that we have addressed

9   the two objections?

10         MR. JONES:  Correct.

11         THE COURT:  Okay.  So I will impose a life term of

12  supervised release subject to the conditions that are in

13  Document No. 5.  I will read them on the record unless you waive

14  the reading of the conditions.  I can tell that you have

15  reviewed them, but do you want me to read them on the record?

16         THE DEFENDANT:  Your Honor, I've read them, and I've

17  got five years worth of experience with them, so I really don't

18  think it's necessary.

19         THE COURT:  All right.  Very good.  Then I won't read

20  them.

21      I will reiterate that they can be changed during your

22  supervision.  You raised a couple of points here, so if those

23  points can't be resolved to your satisfaction, the courthouse is

24  open to you to have the conditions re-evaluated.  So you can do

25  that.  And so those are the conditions that I will impose, those

in Document No. 5.  The term is life.  The incarceration portion
is 14 months, and it runs concurrent with your state sentence.

You've got the right to appeal my decision to revoke your
supervised release if you think it was wrong, and you've got the
right to appeal the sentence that I've imposed, but if you want
to do that, you've got to do it within 14 days of entry of
judgment, which is the document that will formally conclude our
proceedings here.

If you can't afford an attorney to represent you in the
appeal, you can apply for court-appointed counsel to represent
you at government expense.  If you can't afford the filing fee,
you can apply for *in forma pauperis* status and do it without
paying the filing fee.  And did I say 14 days?

MR. JONES:  Yes.

THE COURT:  14 days or 14 days from any appeal filed by
the government if the government were to appeal.

I think I've covered everything, but let's check.  Anything
else, Ms. Altman?

MS. ALTMAN:  Not for me, Your Honor.  Thank you.

THE COURT:  Mr. Jones?

MR. JONES:  Judge, you said it so quickly I didn't
catch how many months was the --

THE COURT:  14.  14 concurrent.

MR. JONES:  I have nothing -- well, just a minute.

(Discussion held off the record between Mr. Jones and the

```
1    defendant.)

2            MR. JONES:  No, nothing else.

3            THE COURT:  All right.  Mr. Schalow, is there anything

4    else I need to touch on?

5            OFFICER SCHALOW:  Nothing else, Your Honor.  Thank you.

6            THE COURT:  Thank you, all.

7            MS. ALTMAN:  Thank you.

8            THE CLERK:  This Honorable Court stands in recess.

9        (Proceedings concluded at 11:17 a.m.)

10                              ***

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1       I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2   Reporter in and for the State of Wisconsin, certify that the

3   foregoing is a true and accurate record of the proceedings held

4   on the 3rd day of March, 2022, before the Honorable

5   James D. Peterson, Chief U.S. District Judge for the Western

6   District of Wisconsin, in my presence and reduced to writing in

7   accordance with my stenographic notes made at said time and

8   place.

9       Dated this 10th day of March, 2022.

10

11

12

13

14

15                              _____/s/ Jennifer L. Dobbratz_____

16                              Jennifer L. Dobbratz, RMR, CRR, CRC
                                    Federal Court Reporter
17

18

19

20

21

22

23

24   The foregoing certification of this transcript does not apply to
     any reproduction of the same by any means unless under the
25   direct control and/or direction of the certifying reporter.